UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **JACE YARBROUGH**, <br><br>            Plaintiff, <br><br> v. <br><br> **THE UNITED STATES SPACE FORCE; THE UNITED STATES DEPARTMENT OF THE AIR FORCE; THE DEPARTMENT OF DEFENSE; LLOYD J. AUSTIN III**, in his official capacity as Secretary of Defense; **FRANK KENDALL**, in his official capacity as the Secretary of the Air Force; and **GENERAL B. CHANCE SALTZMAN**, in his personal capacity and official capacity as the Chief of Space Operations, <br><br>            Defendants. | Case No. 4:23-cv-00876 <br><br> **COMPLAINT** |

## INTRODUCTION

1.  Service members do not forfeit their basic rights and freedoms as American citizens simply because they join the military.

2.  Instead, the different character of the military community and the military mission simply requires a different application of those protections.

3.  But that different application does not apply to members of the Air Force Reserve exercising their private religious and private free speech rights pursuant to the First Amendment to the United States (U.S.) Constitution in their purely civilian off-duty capacity in a private venue.

1

4.      This case arises from Defendants' decision to take adverse, disciplinary action against Plaintiff, Mr. Jace Yarbrough, solely for his private religious belief and private speech on matters of public concern—words spoken as a civilian on behalf of a dear friend at a small, private military retirement ceremony of only 25 persons, most of whom were the retiree's colleagues, family, and close friends.

5.      After years of distinguished service as an active-duty officer, Mr. Yarbrough now serves as a Major (Grade O-4) in the United States Air Force Reserve and as an attorney in his civilian life. As with all active reservists, he lives day to day as a true civilian but serves with his unit for roughly five weeks every year when activated to military status through official orders.

6.      Mr. Yarbrough is a Christian whose sincerely held beliefs animate his actions, viewpoints, and speech. His dear friend, Senior Master Sergeant (SMSgt) Duane Fish, shares a sincere personal faith and invited him to offer remarks at SMSgt Fish's retirement ceremony in Hawaii in June 2021.

7.      At all times relative to the conduct at issue, Mr. Yarbrough was acting in a purely civilian status, with the full rights and freedoms of every U.S. citizen.

8.      In June 2021, Mr. Yarbrough took his wife and child on a trip from Texas to Hawaii, both to serve SMSgt Fish at his retirement ceremony and as a family vacation. Mr. Yarbrough paid all the expenses himself, without any Air Force remuneration whatsoever. He decided whether to deliver the remarks, determined the content of the remarks, and planned the travel logistics completely on his own, without any Air Force orders, input, coordination, or assistance.

9.      As part of that trip, on June 11, 2021, he made a speech during the retirement ceremony

in Pearl Harbor, aboard the Battleship Missouri Memorial, a museum ship managed by a

privately owned nonprofit organization.  Mr. Yarbrough's remarks relevant to this

complaint were an exercise of his sincere religious beliefs, stemming from his belief that

Christians must speak truth as an essential element of faith. He illustrated this point by

quoting one of his personal religious inspirations, Aleksandr Solzhenitsyn—a famous

Christian imprisoned in a Soviet gulag, whom Mr. Yarbrough saw as a representation of

his religious duty to publicly affirm basic truths of the natural law. The remarks also

expressed his viewpoints on matters of public concern.

10.     The remarks that led to Mr. Yarbrough's discipline by his military superiors involved his

warning about politicization within the military. They were not censorious of the military

as a whole but were respectful and provided encouragement to continue widely admired

military values, including honesty, integrity, courage, and competence—values he saw

exemplified by SMSgt Fish's career. The comments included Mr. Yarbrough's concern

that a "culture war" within the military could threaten these very same military values.

Mr. Yarbrough's religious beliefs compelled him to give this speech, in accord with

SMSgt Fish's own wishes.

11.     Although his remarks were praised by some attendees, a Navy member who was present

filed a complaint that made its way to Mr. Yarbrough's Air Force chain of command.

12.     Rather than respecting Mr. Yarbrough's freedom of speech and religion as a civilian

speaking in his personal capacity, his supervisor overstepped military jurisdiction and

issued a Letter of Admonishment (LOA) on August 25, 2021, to Mr. Yarbrough in his

civilian capacity at his home in Texas, alleging that Mr. Yarbrough's remarks had been "insubordinate, disrespectful, and unbecoming of an officer in the military."

13.  Despite multiple administrative appeals up the chain of command, Defendants refused to rescind the discipline, which will continue to have a significant negative impact on Mr. Yarbrough's military and civilian careers. For example, Mr. Yarbrough's supervisors have already decreased his utilization, which Mr. Yarbrough believes is a result of the LOA. Moreover, Defendants erroneously insist that the Armed Forces have jurisdiction to take administrative action against off-duty reservists acting in their civilian capacity, citing an unfounded Air Force instruction, DAFI 36-2907, that oversteps all statutory military authority in violation of the Administrative Procedure Act.

14.  Mr. Yarbrough brings this action to redress his constitutional and statutory rights.

## JURISDICTION AND VENUE

15.  The Court has personal and subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the United States Constitution and federal law.

16.  The Court has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the United States.

17.  The Court has jurisdiction under 28 U.S.C. § 1361 because Mr. Yarbrough seeks to compel an officer or employee of the United States or any agency thereof to perform a duty owed to him.

18.  The Court has jurisdiction under 42 U.S.C. § 2000bb-1 because Mr. Yarbrough's religious exercise has been substantially burdened by Defendants.

19.   The Court has jurisdiction to review Defendants' unlawful actions and inactions, and enter appropriate relief, under the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

20.   The Court has jurisdiction to review and enjoin *ultra vires* or unconstitutional actions by government officials through an equitable cause of action. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–92 (1949).

21.   This Court has authority to award the requested relief pursuant to 42 U.S.C. § 2000bb-1 and *Tanzin v. Tanvir*, 141 S. Ct. 486 (2020); the requested declaratory relief pursuant to 28 U.S.C. § 2201–02; the requested injunctive relief pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 2202; and the costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b).

22.   Venue is appropriate in this district under 28 U.S.C. § 1391(e) because Defendants are located here and a substantial part of the acts giving rise to these claims occurred here.

## THE PARTIES

### Plaintiff

23.   Mr. Yarbrough is a civilian attorney in Texas, where he lives with his wife and children.

24.   He received an active-duty commission as an officer in the Air Force on September 7, 2011, but he has served as a reservist in the Air Force since late 2015, currently holding the rank of Major. He has been recognized as a dedicated and valuable member of the Air Force, receiving official decorations and high praise from his superiors throughout his military career.

25.   He is also a committed Christian, whose sincerely held religious beliefs motivate his speech and conduct and include adherence to the Christian Natural Law tradition. He believes God wrote this objective, natural law in the hearts of all persons, in part to guide

them in right action. Mr. Yarbrough's speech at issue here encouraged the audience not to suppress objective realities and truths made evident to them by the natural law written on their hearts.

### Defendants

26. The U.S. Space Force is a separate and distinct branch of the armed services, organized under the Department of the Air Force, and under which occurred the disciplinary action at issue herein.

27. The U.S. Department of the Air Force is the executive department under which Mr. Yarbrough currently serves as a reservist, and under which occurred the disciplinary action at issue herein.

28. The Department of Defense (DoD), is an executive branch department that coordinates and supervises all agencies and functions of the government related to the U.S. Armed Forces, including the disciplinary action at issue herein.

29. Lloyd J. Austin III, in his official capacity as the U.S. Secretary of Defense, is the principal assistant to the U.S. President in all matters relating to the U.S. Department of Defense, including the disciplinary action at issue herein.

30. Frank Kendall, in his official capacity as the Secretary of the Air Force, is responsible for organizing, training, and equipping the Department of the Air Force and U.S. Space Force, as well as supervising their functions, including the disciplinary action at issue herein.

31. General B. Chance Saltzman, in his individual capacity and official capacity as Chief of Space Operations, U.S. Space Force, is a member of the Joint Chiefs of Staff and the

senior uniformed Space Force officer responsible for the organization, training and equipping of all space forces. On July 29, 2022, General Saltzman—through his agent, Brigadier General Gail E. Crawford—took "final action" and denied Mr. Yarbrough's final appeal to rescind the disciplinary action at issue herein.

## FACTS

### General Background

32.    Mr. Yarbrough was raised in a Christian home in a small town in west Texas. His grandfather was a Christian pastor, and his faith was central to his upbringing. He attended The University of Texas at Austin from 2005 to 2009, where he received a Bachelor of Arts degree in Government and a Bachelor of Science degree in Electrical and Electronics Engineering.

33.    As an undergraduate, Mr. Yarbrough studied under Professor J. Budziszewski, a philosopher who has taught and written extensively about the Natural Law, self-deception, and Christian belief and doctrine. Mr. Yarbrough's coursework under Dr. Budziszewski included a course titled, "Natural Law Theory."

34.    Motivated to pursue public service while in college, Mr. Yarbrough participated in a year-long Christian fellowship at the John Jay Institute for Faith, Society and Law.

35.    Soon after college, he believed that God was calling him to serve in the military on active duty. For that reason, he volunteered for and received an active-duty commission in the U.S. Air Force.

36.    From 2010 to 2011, while waiting to attend Air Force Officer Training School, he taught in a Christian school in Tegucigalpa, Honduras.

37.    In the fall of 2022, Mr. Yarbrough and his wife founded a private, low-cost Christian Academy for families in their community. Mr. Yarbrough currently serves as the headmaster of this academy, where he leads morning, noon, and evening prayer each school day.

38.    Mr. Yarbrough continues to practice his sincerely held religious beliefs. Some public expressions of that faith include weekly Mass attendance, teaching children's catechesis at his home parish, and hosting Christian men's discussion groups.

## Initial Active-Duty Assignment

39.    On September 7, 2011, Mr. Yarbrough was commissioned as a second lieutenant in the U.S. Air Force. He completed initial technical training in various courses involving systems acquisition, logistics, and systems planning.

40.    In his first assignment as the Chief of Reverse Engineering, at Robins Air Force Base (AFB), Georgia, he provided leadership, motivation, and training to a fourteen-member reverse-engineering team. During this time, he and his team developed organic repair capability for dozens of Air Force weapon systems.

41.    While at Robins AFB, he continued his training, taking courses in test and evaluation, acquisition management, and software acquisition management.

42.    Mr. Yarbrough's superiors at Robins AFB praised his outstanding leadership. In his annual Officer Performance Reports (OPRs), his supervisor rated him #1 of 75 engineers in the squadron in 2012 and #1 of 13 Company Grade Officers (CGOs) in 2013.

43.    He also won multiple individual awards for leadership excellence—all as a second lieutenant—at the Group, Wing, Base, and Major Command (MAJCOM) levels

including: Air Force Materiel Command's Airlift/Tanker Young Leadership award (2013); Warner Robins Air Logistics Complex's (WR-ALC) Lance P. Sijan award (2013); WR-ALC Captain Roland R. Obenland Engineering Memorial award (2013); WR-ALC's Company Grade Officer of the Quarter (CGOQ) (twice in 2013); 402 Maintenance Wing's CGOQ (2012); 402 Electronics Maintenance Group Ten Outstanding Young Americans award (2012). During this period, Mr. Yarbrough also led the Reverse Engineering Team to win the WR-ALC Maintenance Depot Team of the Year (2012). For his service at Robins AFB, Mr. Yarbrough was awarded the Air Force Achievement medal.

**Active-Duty Service in the National Capitol Region (Washington, D.C.)**

44.     In 2013, Mr. Yarbrough was reassigned to the U.S. Air Force Honor Guard at Joint Base Anacostia–Bolling in Washington, D.C. The USAF Honor Guard is the Air Force's most elite ceremonial unit, rendering military honors for deceased veterans at Arlington National Cemetery and representing the Air Force at ceremonies in the National Capitol Region (NCR) and around the world.

45.     While in D.C., Mr. Yarbrough served as an executive officer and then flight commander for multiple operational flights. In this capacity, he led more than fifty airmen and commanded more than 500 missions and elite ceremonies.

46.     His superiors continued to laud his leadership in his annual OPRs, rating him #1 of 44 Lieutenants in 2014 and #2 of 6 Group CGOs in 2015.

47.     He also continued to be recognized for his excellence as a leader, winning awards as the 11th Wing CGOQ twice in 2014.

48.    For his service at Joint Base Anacostia-Bolling, Yarbrough was awarded the Air Force
Commendation medal.

**Working Relationship with SMSgt Fish**

49.    While serving in D.C., Mr. Yarbrough worked closely with SMSgt Fish, the flight
superintendent for the first operational flight Mr. Yarbrough commanded.

50.    He and SMSgt Fish developed a close working relationship and friendship.
Mr. Yarbrough and SMSgt Fish shared certain religious beliefs and values, including
about the importance of leadership and integrity.

51.    He and SMSgt Fish would often speak about how their faith and values informed their
conduct and leadership roles in the military.

52.    He served beside SMSgt Fish until leaving active duty to attend law school, at which
point, he transitioned to the Air Force Reserve in 2015.

**Law School and Initial Air Force Reserve Service**

53.    On September 24, 2015, after four years on active duty, Mr. Yarbrough was honorably
discharged from active duty to pursue a career in the Air Force Reserve. In addition to the
decorations listed above, during his time on active duty Mr. Yarbrough was awarded the
Outstanding Unit Award, the National Defense Service Medal, and the Global War on
Terrorism Service Medal.

54.    From 2015 to 2018, Mr. Yarbrough attended Stanford Law School, where he served as
President of the Federalist Society and Co-President of the Kirkwood Moot Court
Competition.

55.     In September 2015, he also began service in the Air Force Reserve as an Individual

Mobilization Augmentee (IMA). Unlike traditional reservists who serve in uniform one

weekend per month and two weeks a year, IMA reservists have very flexible service

schedules and perform military duties (and receive compensation) during specific,

discrete periods when placed "in status" by their military units.

56.     While attending law school, Mr. Yarbrough served as the IMA to the Director of

Operations (DO) of a cyber operational test squadron at Joint Base San Antonio, San

Antonio, TX. He completed his reserve duties during summer breaks, traveling back to

California for school during the academic year.

57.     As an IMA to the DO, Mr. Yarbrough directed his 190-member squadron in day-to-day

operations testing cyber assets. In 2019, he was competitively selected for and graduated

from Air Force Reserve Command's Leadership Today and Tomorrow, a leadership

course designed to "bridge the gap between the tactical Company Grade Officer and the

operational Field Grade Officer."

58.     Reserve leadership continued to recognize Mr. Yarbrough's excellence in his OPRs. His

commander rated him #1 of seven Group IMA CGOs in 2019 and #1 of eight IMA

Captains in 2020.

59.     During his service at Joint Base San Antonio, Mr. Yarbrough was awarded two additional

Air Force Commendation medals.

60.     Mr. Yarbrough continues to voluntarily serve in the Air Force Reserve despite the fact

that his Reserve Obligation Termination Date was June 6, 2019.

61.     He obtained his Juris Doctor (J.D.) from Stanford Law School in 2018.

### Reserve Service in Colorado

62.    Beginning in November 2020, Mr. Yarbrough was assigned to Peterson Space Force
Base (SFB), CO, serving as IMA to the Branch Chief of Operations and Requirements,
Headquarters Space Operations Command.

63.    In that same year (2020), he received an early promotion to his current rank of
Major (O-4).

64.    Roughly one year after he joined, and soon after the events that gave rise to this lawsuit,
his unit underwent many administrative changes and a relocation to the east coast.  As a
result, he is currently assigned to Space Systems Command at Patrick SFB, FL, where he
serves as IMA to the Chief, Enterprise Integration Division.  In this role, he assists the
Chief of his division as directed.

### Civilian Legal Practice

65.    Though he serves for a brief period each year as an Air Force reservist, Mr. Yarbrough is
employed full time as an attorney in private practice in the Dallas, Texas area.

66.    After five years as a commercial litigation and intellectual property associate in global
law firms, Mr. Yarbrough joined the firm of S|L Law, PLLC, where he litigates a variety
of matters.

### Mr. Yarbrough's Sincere Religious Beliefs Motivated His Conduct and Speech

67.    Mr. Yarbrough's sincere Christian faith is central to his worldview, choices, conduct, and
speech.

68.    Mr. Yarbrough has recently served in multiple church roles, including lay reader, lector,
and acolyte.

69.     He and his wife completed the Rite of Christian Initiation of Adults (RCIA) during Easter 2023, fully entering into communion with the Roman Catholic Church.

70.     Mr. Yarbrough believes that God has used Christian thinkers, such as C.S. Lewis, Francis Schaeffer, and, as particularly relevant to the remarks at issue, Aleksandr Solzhenitsyn, to inspire and shape his life, beliefs, and religious exercise.

71.     He shares Solzhenitsyn's deeply rooted religious conviction to actively live out his faith by testifying to the truth. As such, he feels obliged as a religious exercise to live out his faith by speaking the truth even at great personal cost.

**SMSgt Fish Requested Mr. Yarbrough to Deliver Remarks as a Personal Favor**

72.     Because of their shared friendship, faith, and values, in early 2021 SMSgt Fish asked Mr. Yarbrough to preside at his retirement ceremony, offering some remarks regarding SMSgt Fish's service. Both military personnel and civilians may preside at retirement ceremonies. AFPAM 34-1202 at 6.3.1; AFI 26-3203 at 7.1.3.2. The retirement ceremony took place in Hawaii in June 2021.

73.     Mr. Yarbrough felt honored to deliver these remarks on behalf of a person whom he admired for his professional service, leadership, personal character, and shared values.

74.     The two agreed that his remarks should touch on matters of integrity, courage, and leadership, values SMSgt Fish exemplified in his military career.

**Mr. Yarbrough Delivered the Remarks as a Civilian**

75.     Mr. Yarbrough agreed to deliver the remarks as a personal favor to a friend, not as an official Air Force duty. It was also an opportunity to take a brief vacation to Hawaii with his wife and infant child.

76.   Mr. Yarbrough's family paid all their own expenses for the trip from Texas to Hawaii, including the cost of all flights, hotels, meals, and rental car. The Air Force did not pay or offer to remunerate any expenses associated with the trip, nor did Mr. Yarbrough receive any remuneration from the Air Force whatsoever for or during this trip.

77.   Mr. Yarbrough and his family arrived in Hawaii in early June, two days before the ceremony, and returned to Texas the day following the ceremony. While in Hawaii, his family also spent time doing traditional vacation activities unrelated to the ceremony.

78.   At no point during the family's Hawaii trip did the Air Force activate Mr. Yarbrough to change his civilian status to a military status, nor did the Air Force provide him official direction or issue any orders for him to travel to or attend the event.

79.   No member of Mr. Yarbrough's military unit or SMSgt Fish's chain of command ever coordinated with Mr. Yarbrough about the trip or the ceremony.

80.   SMSgt Fish's Retirement Ceremony was held aboard the Battleship Missouri Memorial in Pearl Harbor, Hawaii, on June 11, 2021.

81.   The Memorial is run by a privately owned, 501(c)(3) nonprofit organization—the USS Missouri Memorial Association.

82.   In addition to military ceremonies, the USS Missouri Memorial Association offers the memorial to the public for year-round community and other private events, as well as for events that commemorate the history aboard the ship sponsored by the private nonprofit organization that maintains the memorial.

83.   On or around June 9, 2021, Mr. Yarbrough attended a rehearsal for SMSgt Fish's retirement ceremony. Then, on June 11, he and his family attended the event.

84.  Because of COVID-19 restrictions, total attendance at the retirement ceremony was limited to twenty-five persons. Thirteen of those attendees were members of SMSgt Fish's family, with an additional group of his personal military friends, including Mr. Yarbrough and his family. The only other military personnel attending the event were SMSgt Fish's commander, Colonel Richard Smith, Chief Master Sergeant Jason Farris, and a handful of support personnel, including a standard Navy quartet.

85.  While attending the event, Mr. Yarbrough was an inactive reservist in a purely civilian status. He was not participating in any form of Air Force inactive duty training, nor was he between inactive duty training sessions or receiving remuneration from the Air Force for his time spent attending the event.

86.  In keeping with the tradition of military retirement and other private formal ceremonies, Mr. Yarbrough wore his Air Force uniform to the event.

87.  Air Force Instructions authorize inactive reservists to wear uniforms on occasions such as military ceremonies and social military functions but do not instruct that doing so converts the reservist into military status.  DAFI 36-2903, dated February 7, 2020, provides guidance for uniform wear by retirees, reservists, and other former military personnel who are now separated from the Air Force.

88.  In particular, Paragraph 11.1.2 of that instruction, which purports to apply to "[r]eservists not on extended active duty," authorizes the wearing of the Air Force uniform in various capacities, such as when a reservist in civilian status is "traveling as a passenger on military aircraft," during "occasions of military ceremonies," and during "social functions and informal gatherings of a military nature."

**Mr. Yarbrough's Speech Expressed His Religious Beliefs and Viewpoints on Matters of Public Concern**

89.   Midway through the retirement event, Mr. Yarbrough delivered his remarks to SMSgt Fish, SMSgt Fish's family, and the other attendees. He began by praising the dedication of SMSgt Fish's wife and daughter, quoting from one of the Christian intellectuals that inspired his personal faith, C.S. Lewis.

90.   Mr. Yarbrough's remarks lauded SMSgt Fish's courage and competence as an airman, telling stories and notable events from their shared time in the Air Force. He especially praised SMSgt Fish's steadfastness, courage, and integrity while in the Honor Guard in the face of adversity.

91.   His remarks next turned to encouraging people to practice in their own lives the courage and virtue that SMSgt Fish exemplified, a practice he stated is particularly necessary at this moment in time.

92.   In keeping with that theme, he expressed his personal concerns about the negative impact of politicization within the military, and how it tends to squelch the courage, integrity, and competence that SMSgt Fish exemplified. He worried that "radical" factions in "our wider culture" have "brought the culture war inside the DoD," and that politicization of the military would be "a death knell for courage and competence."

93.   To support his views, he drew on the teachings and thought of Eastern Orthodox Christian and writer Aleksandr Solzhenitsyn, famously the author of *Live Not by Lies*. Motivated by their shared faith as Christians, Mr. Yarbrough echoed Solzhenitsyn regarding the corrosive cultural consequences of dishonesty and self-deception. He warned against a growing "cancel culture" in the military that, in his view, undermines

truth and integrity. This cancel culture pressures military members to deceive themselves about objective realities they know to be true (what Mr. Yarbrough termed, "matters of basic common sense and wisdom"). Mr. Yarbrough expressed his conviction that lying to oneself out of fear makes a person less competent and less courageous.

94.    Mr. Yarbrough gave two examples of objective realities he believes are known intuitively to all persons as persons: 1) "men can't birth babies" and 2) "boys should not be allowed in girls' locker rooms."

95.    He expressed his faith-based belief that forcing people to deny such self-evident beliefs "requires constant . . . self-deception," which can "habituate [us] to dishonesty" and cause us to lose our "grip on objective reality," making us "less capable and less effective in our world. By making the lie a part of ourselves, we become incompetent."

96.    As part of his warning against politicization, he referenced "recent DoD-wide extremism training" that he had attended, in which he "was relieved to see that [his] teammates recognized that training for what it was, a thinly veiled flex of political power." Ironically, Mr. Yarbrough's remarks actually advance the DoD policy of identifying and quelling extremism according to its nonpartisan plain meaning. *See* Lloyd J. Austin III, *Video: A Message From the Secretary of Defense on Extremism*, U.S. Dept. of Def. (Feb. 19, 2021, at 3:29–59), https://www.defense.gov/News/News-Stories/Article/Article/2509632/a-message-from-the-secretary-of-defense-on-extremism/ ("I also want you to share with your leadership your own personal experiences with encountering extremists and extremist ideology in the military. . . . And I want your leadership to listen to those stories and I want them to listen to any ideas you might have to help us. . . .").

97.    His expression of these views was an expression of his religious exercise as a devout Christian who believes that speaking truth is an essential element of living out his faith and was also an expression of his private speech on matters of public concern.

98.    Expressly connecting this theme with faith, he ended his remarks by noting that Solzhenitsyn came to realize he was imprisoned in a gulag because he had "gone along with falsehoods and euphemisms that made such a brutal society as the Soviet Union possible."

99.    He then shared the following quote from Solzhenitsyn's play, "Candle in the Wind," which describes a person's religious and moral duty to speak truth in the world:

> *To stand up for truth is nothing. For truth, you must sit in jail. You can resolve to live your life with integrity. Let your credo be this: Let the lie come into the world, let it even triumph. But not through me. The simple step of a courageous individual is not to take part in the lie. One word of truth outweighs the world.*

100.    In his remarks at the event, Mr. Yarbrough believed he was living out Solzhenitsyn's example that religion required one not simply to believe in truth, but also to profess it in the world.

101.    While giving his remarks, Mr. Yarbrough observed a positive reaction from attendees, many of whom he knew shared his faith-based values.

102.    Immediately after the event and throughout the post-ceremony events, he experienced only positive interactions with the attendees, who complimented his remarks. He was even asked by the spouse of another active-duty member in attendance if he would speak at her husband's upcoming retirement ceremony from the Air Force.

**The Air Force's Investigation Was Unreasonable and Arbitrary**

103.   One week after the event, SMSgt Fish called Mr. Yarbrough to inform him that an

individual(s) from the Naval quartet had filed a complaint against him due to his remarks.

104.   Mr. Yarbrough immediately called his supervisor regarding the incident and discovered

that his supervisor had already been notified of the complaint the night before.

105.   On Friday, July 9, 2021, Mr. Yarbrough received an email from Major Derek Law, who

explained that he was "directed" by Mr. Yarbrough's supervisor to perform an inquiry

into the retirement event remarks.

106.   On Monday, July 26, 2021, Lieutenant Colonel (Lt Col) Peter J. Schmick emailed Mr.

Yarbrough the following excerpts from statements made by unspecified persons

apparently present for his remarks: "members were offended by the guest speakers

comments"; "he definitely shared some personal view points that should not have been

shared in the retirement ceremony"; "informed that there were some inappropriate

comments made by the guest speaker at the subject event targeted at the LGBT

community and other political issues currently taking place in our country"; "at this event

feeling extremely uncomfortable and insulted"; "let you know that such comments are

unnecessary and have no place in a ceremony like this"; and "his comments were hurtful

to a group of people."

107.   The email excluded the following positive assessment of the remarks from one witness:

"professional and respectful. I was not offended by it and there was nothing said or done

that was unethical, illegal, or immoral. . . . It is hard to understand how any person may

have been offended by his comments as they were not directed at any person or group."

**The Letter of Admonishment Criticizing Mr. Yarbrough's Religious Speech and Speech on Matters of Public Concern**

108.    In September 2021, Mr. Yarbrough, in his civilian capacity, received a certified mail package at home containing a Letter of Admonishment, dated August 25, 2021, signed by Lt Col Schmick.

109.    The LOA reprimanded Mr. Yarbrough for his retirement ceremony remarks, made while in civilian status, and stated that Mr. Yarbrough's speech had been "insubordinate, disrespectful, and unbecoming for an officer in the military."

110.    The LOA condemned specific remarks, including his references to "radical political factions," "how the military is fostering a culture of 'incompetence and cowardice,'" and "DoD-wide extremism training as a 'thinly veiled flex of political power.'"

111.    The LOA stated that Mr. Yarbrough's expressed viewpoints were improper because "[m]ilitary members are to remain apolitical and must respect the chain of command."

112.    The LOA referenced "several military members expressing displeasure with the contents of [Mr. Yarbrough's] speech." While acknowledging that Mr. Yarbrough had the right "as an American Citizen to voice [his] opinions concerning political matters," the LOA stressed that "[he] cannot imply those beliefs are representative of the Air Force, and [his] statements cannot be contemptuous."

113.    The LOA instructed Mr. Yarbrough to "exercise better judgement and use appropriate venues for expressing personal views that align and comport with AFI 51-508 and AFI 1-1 for exercising [his] free speech rights."

114.    In addition to the LOA, Lt Col Schmick attached six witness statements and excerpts from the initial complaint. In addition to the witness who found the speech to be

"professional and respectful," two other witnesses understood the speech as an expression of Mr. Yarbrough's religious beliefs. One noted that Mr. Yarbrough's "personal/religious views seemed to be in conflict with the rights of the LGBTQ community." Another noted that "his message had a religious tone to it."

115.    On November 5, 2021, Mr. Yarbrough submitted a response to Lt Col Schmick, requesting that the Air Force rescind the LOA. This response was four pages long, arguing that the LOA was outside the Air Force's jurisdiction, that his speech was protected under the First Amendment, and that his remarks had been apolitical.

116.    On December 17, 2021, Staff Judge Advocate Andrea M. Hall denied Mr. Yarbrough's request in a short, two-paragraph response. As authority to discipline him while in civilian status, the response cited AFI 36-2907, para. 2.1, which states:

> ***Use of Administrative Counselings, Admonishments, and Reprimands***. *General officers, commanders, first sergeants, supervisors, and other individuals in the member's administrative or operational chain of command can issue administrative actions. This includes issuing administrative counseling, admonishment, and reprimands to ARC Airmen who commit an offense while in civilian status.*

**Chief of Space Operations, U.S. Space Force Finally Rejected Mr. Yarbrough's Appeal of the LOA**

117.    On January 26, 2022, Mr. Yarbrough submitted his first appeal to Colonel James T. Horne. It was a four-page response to the December 17, 2021 decision. He argued in detail that the Air Force did not have jurisdiction over him at the time he made his speech, that his speech was protected by the First Amendment, and that punishing him for his speech was unlawful viewpoint discrimination.

118.    On February 4, 2022, Staff Judge Advocate Colonel Ted Richard issued a one-page denial of that appeal. The denial again cited AFI 36-2907 as granting the Air Force

jurisdiction over Mr. Yarbrough while in civilian status. The denial also argued that criminal jurisdiction was inapplicable to the case because the LOA was an administrative action. Lastly, it rejected out of hand Mr. Yarbrough's free speech claim, emphasizing that "courts have been quick to reiterate that servicemembers' rights are not the same as their civilian counterparts. OpJAGAF 2013-3, citing *United States v. Zimmerman*, 43 MJ 782, 785 (ACCA 1996) (citing *United States v. Priest*, 45 C.M.R. 338 (CMA 1972))."

119.    On April 12, 2022, Mr. Yarbrough filed a second appeal with a five-page letter to Brigadier General (Brig Gen) Douglas A. Schiess. In this appeal, he again argued the lack of jurisdiction and claimed protection under the First Amendment. He also refuted Colonel Richard's claim that he had fewer First Amendment rights, noting that this analysis was inapplicable to remarks that he gave while in a purely civilian status.

120.    On April 18, 2022, Brig Gen Schiess denied the appeal in a mere two sentences, informing Mr. Yarbrough that, after consulting with his legal team, he had decided to uphold the LOA.

121.    On July 20, 2022, Mr. Yarbrough submitted a third appeal to Lieutenant General (Lt Gen) Stephen Whiting. This six-page appeal reiterated the earlier jurisdictional argument and expanded on his argument that his speech was protected under the First Amendment. This appeal also argued that the LOA was an arbitrary and capricious disciplinary action violating Mr. Yarbrough's right to free speech.

122.    On July 29, 2022, Lt Gen Whiting denied Mr. Yarbrough's appeal in a four-sentence response, again citing AFI 36-2907 and "applicable law."

123.    On October 20, 2022, Mr. Yarbrough submitted his fourth and final appeal to the Chief of
Space Operations, U.S. Space Force. This six-page appeal reiterated his prior arguments,
as well as an argument that the LOA was arbitrary and capricious.

124.    On December 16, 2022, Brig Gen Gail E. Crawford, the Director of the Air Force's
Military Justice and Discipline division, issued a final denial of that appeal on behalf of
the current Chief of Space Operations, General B. Chance Saltzman. In that letter, Brig
Gen Crawford stated that the denial of the appeal was "my final action on [Mr.
Yarbrough's] request to rescind the LOA."

125.    The Air Force's December 2022 denial was a final action. Additional attempts to appeal
the LOA would be futile. The shrinking amount of substance in each subsequent denial
letter reflects the Air Force's firm and final decision not to rescind the LOA.

**Adverse Impact of the LOA on Mr. Yarbrough's Career**

126.    Unless the LOA is rescinded, it will continue to adversely impact Mr. Yarbrough's
career. The LOA in his record also increases the risk of future, more severe adverse
action, including increasingly severe administrative reprimands, relief for cause from
leadership positions, denial of promotion, removal from promotion lists, and perhaps
even criminal prosecution by court-martial. Subsequent adverse actions could also serve
as the basis for a discharge and could impact his discharge status. The LOA negatively
impacts both his military and civilian careers, including by precluding future career
opportunities and advancement. Mr. Yarbrough believes his duties have already been
reduced as result of the LOA.

127.    Moreover, the issuance of the LOA has already chilled and hindered Mr. Yarbrough's
ability to engage in his rights to freedom of speech and religion. The issuance of the LOA

for his purely civilian religious speech has created a threat that his civilian speech or

religious practice could trigger additional military discipline.

128.   Further, as a civilian attorney, he may be required to work for clients dealing with First

Amendment issues, including free speech or religious liberty cases related to the Air

Force. The issuance of the LOA for actions engaged in while in his civilian capacity

creates a threat that his civilian advocacy could subject him to additional military

discipline.

## FIRST CAUSE OF ACTION
### AFI 36-2907, Para. 2.1, Exceeds Statutory Jurisdiction
(APA Jurisdictional Claim, 5 U.S.C. § 706(2)(C))

129.   Mr. Yarbrough incorporates by reference paragraphs 1–128 of this complaint as though

fully set forth herein.

130.   The DoD, Department of the Air Force, and U.S. Space Force are "agencies" under the

Administrative Procedure Act (APA), 5 U.S.C. § 701(b).

131.   The LOA complained of herein is an "agency action" under 5 U.S.C. § 551(13) as an

"order" or "sanction" under 5 U.S.C. § 551(4), which was "made reviewable by statute,"

or is a "final agency action for which there is no other adequate remedy in a court" under

5 U.S.C. § 704.

132.   Defendants' action is "final" because Mr. Yarbrough appealed the issuance of the LOA

up the chain of command until receiving a final rejection on December 16, 2022, stating

that the denial of the appeal was a "final action on your client's request to rescind the

LOA." Further attempts to appeal the LOA would be futile.

133.    Mr. Yarbrough has suffered and will continue to suffer concrete, actual, particularized harm from the LOA. Not only is the LOA a lasting negative mark on his record and reputation, but it also will hinder his ability to receive promotions and permanently restrict his career growth as a commissioned officer and in his civilian career.

134.    The LOA complained of herein was issued against Mr. Yarbrough "in excess of statutory jurisdiction, authority, or limitations" under 5 U.S.C. § 706(2)(C).

135.    Defendants have not cited any statutory authorization that would permit military discipline against Mr. Yarbrough for his activities while in a purely civilian status.

136.    The only authority that Defendants have cited for issuance of the LOA is Department of the Air Force Instruction 36-2907, para. 2.1, which purports to permit the issuance of "administrative counseling, admonishment, and reprimands to Air Reserve Component (ARC) Airmen who commit an offense while in civilian status." That paragraph of the regulation exceeds the Air Force's statutory authority, making it null and void and a violation of the APA.

137.    Pursuant to 10 U.S.C. § 9013(g), "The Secretary of the Air Force may . . . prescribe regulations to carry out his functions, powers, and duties under this title." There is no support, either in the text of this Code provision or its legislative history, for Defendants' position that Congress intended to grant a service secretary authority to expand the Air Force's jurisdictional reach over reservists in a civilian status.

138.    The only statutory authority granting the Armed Forces jurisdiction to exercise military jurisdiction over reservists subject to adverse administrative action is contained in the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 802, which grants military

jurisdiction for adverse administrative action only if a reservist is on active duty, participating in inactive-duty training, or performing military duties while receiving military pay or allowances and submitting voluntarily to military authority.

139.    Mr. Yarbrough was neither on active duty, nor participating in inactive-duty training at the time he made the remarks for which he was disciplined.

140.    Further, he received no military pay or allowances from Defendants for his time spent at the event, nor did he submit to military authority, at the time he made the remarks for which he was disciplined, nor was he performing military duties.

141.    The UCMJ does not extend military jurisdiction for adverse administrative actions over inactive reservists in civilian status. *See, e.g.*, *United States v. Hale*, 78 M.J. 268, 271 (C.A.A.F. 2019); *United States v. Morita*, 73 M.J. 548 (A.F. Ct. Crim. App. 2014); *Duncan v. Usher*, 23 M.J. 29, 34 (C.M.A. 1986) ("[The UCMJ] makes no provision for jurisdiction over someone who is 'essentially' on active duty. Like pregnancy, active duty is an all-or-nothing condition: A Reserve either is on active duty or he is not!").

142.    Further, "a reservist must be in status to perform duty. It is status, as opposed to duty, that determines when pay and other entitlements and benefits accrue." *United States v. Cline*, 26 M.J. 1005, 1007 (A.F.C.M.R. 1988), *aff'd*, 29 M.J. 83 (C.M.A. 1989).

143.    In addition, Defendants' *ultra vires* assertion of power in issuing the LOA to Mr. Yarbrough contradicted the Air Force's own admission in a prior case that its own regulations do not apply to the "off-duty conduct" of members who are not on active duty. *See Wilson v. James*, 139 F. Supp. 3d 410, 429 (D.D.C. 2015), *aff'd*, No. 15-5338, 2016 WL 3043746 (D.C. Cir. May 17, 2016) ("Plaintiff claims that AF 1–1 did not apply

to him in civilian status, and he was in civilian status when he made his Facebook posts

that resulted in [a Letter of Reprimand]; [The Air Force] agree[s.]").

144.    Similarly, in January 2022, the Department of the Army Suitability Evaluation Board

(DASEB) acknowledged key statutory limitations on military jurisdiction, finding

jurisdictional overreach and retracting administrative discipline against an Army National

Guard captain who was disciplined for his participation in a Black Lives Matter protest in

his off-duty status (e.g., non-Title-10 duty status). *See* Record of Proceedings, Dept. of

the Army: Suitability Evaluation Board (DASEB), Docket No. AR20210006717,

https://coloradonewsline.com/wp-

content/uploads/2022/01/Kennedy_DASEB_Decision_03JAN22_redacted-1.pdf.

145.    That Mr. Yarbrough wore a uniform at the time he made his remarks is insufficient to

establish jurisdiction, as no statute grants Defendants jurisdictional authority simply

because a person wears a uniform. Defendants' own regulations permit civilians to wear

military uniforms on occasion. *See, e.g.*, AFI 36-2903, para 11.1.2 (authorizing a reservist

in civilian status to wear the uniform during "occasions of military ceremonies" and

"social functions and informal gatherings of a military nature").

146.    Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to

redress the injuries he is suffering and will continue to suffer because of the LOA,

including undue hardship, reputational injury, and irreparable harm to his military and

civilian career prospects.

147.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that

AFI 36-2907, para. 2.1, exceeds statutory jurisdiction under 5 U.S.C. § 706(2)(C); and to

a declaration that the military has no future authority to take disciplinary actions against

him for his speech done while in civilian status. Additionally, he is entitled to damages in an amount to be determined by the evidence and this Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**SECOND CAUSE OF ACTION**
**The LOA Violates the Religious Freedom Restoration Act (RFRA)**
(RFRA Claim, 42 U.S.C. § 2000bb-1)

148.    Mr. Yarbrough incorporates by reference paragraphs 1–147 of this complaint as though fully set forth herein.

149.    The Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb et seq., prohibits the "government" from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1.

150.    RFRA applies to Defendants as part of the "government," which includes "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2(1).

151.    RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4) (incorporating the definition in 42 U.S.C. § 2000cc-5(7)(A)). It applies to all sincere religious claims. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006).

152.    "[F]ederal courts have no business addressing . . . whether the religious belief asserted in a RFRA case is reasonable." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014).

28

153.    Although RFRA does not define "substantial burden," if a person "face[s] serious disciplinary action" for exercising religion, a substantial burden exists. *Holt v. Hobbs*, 574 U.S. 352, 361 (2015).

154.    RFRA permits the substantial burden of religion only if government can "demonstrate[] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

155.    Mr. Yarbrough's remarks during SMSgt Fish's retirement ceremony were a direct exercise of his sincerely held religious beliefs and duties, as described herein.

156.    Defendants' formal, written admonishment of Mr. Yarbrough, a commissioned reserve officer, labeling his exercise of religion as "insubordinate, disrespectful, and unbecoming of an officer in the military," was serious enough to create a substantial burden on his religious exercise.

157.    Defendants cannot demonstrate a compelling interest in substantially burdening Mr. Yarbrough's religious exercise here, where he shared his remarks in his private capacity, on private property, during a friend's retirement ceremony, to a small group consisting mostly of the retiree's family and friends.

158.    Defendants cannot demonstrate that formally admonishing Mr. Yarbrough was the least restrictive means of furthering any purported compelling interest because multiple, lesser restrictive methods could have furthered any purported interest.

159.    Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to redress the injuries he is suffering and will continue to suffer because of the LOA,

including undue hardship, reputational injury, and irreparable harm to his military and

civilian career prospects.

160.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that

Defendants violated his rights under RFRA; and to an injunction against future

substantial burdens on his religious exercise. Additionally, he is entitled to damages in an

amount to be determined by the evidence and this Court, and the reasonable costs of this

lawsuit, including reasonable attorneys' fees.

### **THIRD CAUSE OF ACTION**
**The LOA Is Contrary to the Free Exercise of Religion**
(APA Constitutional Claim, 5 U.S.C. § 706(2)(B))

161.    Mr. Yarbrough incorporates by reference paragraphs 1–160 of this complaint as though

fully set forth herein.

162.    The LOA complained of herein is a final, reviewable agency action that is causing

actionable injury to Mr. Yarbrough, as set forth in paragraphs 126-128.

163.    The LOA was an agency action that was "contrary to constitutional right." 5 U.S.C.

§ 706(2)(B). Specifically, it was contrary to Mr. Yarbrough's rights under the Free

Exercise Clause of the First Amendment.

164.    "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const.

amend. I.

165.    The "loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976);

*see also Palmer v. Waxahachie Indep. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009)

(noting that the loss of First Amendment freedoms justifies a preliminary injunction).

166.    "[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421–22 (2022) (citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U. S. 520, 546 (1993)).

167.    "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1877 (2021). "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*¸ 508 U.S. at 534).

168.    "A [policy] is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Emp. Div., Dept. of Human Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)). Further, a policy is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id*.

169.    If a policy lacks neutrality or general applicability, courts "will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Kennedy*, 142 S. Ct. at 2422.

170.    Mr. Yarbrough's remarks during SMSgt Fish's retirement ceremony were a direct exercise of his sincerely held religious beliefs and duties, as described herein.

171.    The LOA used to discipline him for his retirement ceremony remarks substantially
burdened his sincerely held exercise of religion by admonishing him for engaging in that
exercise. Further, the LOA flowed from a policy that was neither neutral nor generally
applicable.

172.    The LOA was not based on a neutral policy because it restricted Mr. Yarbrough's
conduct due to its religious nature, calling it "contemptuous" and threatening him with
additional military discipline should he commit similar conduct in the future.

173.    The LOA was not based on a generally applicable policy because Defendants have
exempted similarly situated servicemembers engaging in non-religious conduct from
discipline and have encouraged certain military members—while on active duty and in
uniform—to publicly engage in non-religious criticism of similar military policies,
drawing significant media attention.

174.    A notable example of the lack of general applicability in Defendants' policies occurred in
2019, when Defendants permitted servicemembers in uniform to participate without
discipline in a political parade "to show opposition to the Trump Administration's ban on
transgender troops." *See* Ramon Galindo and Monica Garske, *San Diego Unites for 2019
Pride Parade*, July 13, 2019, available at https://www.nbcsandiego.com/news/local/san-
diego-unites-for-pride-parade-2019/132618; *see also* Shawn Fleetwood, *The Air Force is
Using Taxpayer Money to Fly Service Members to Branch 'Pride' Events*, THE
FEDERALIST, available at https://thefederalist.com/2023/06/06/the-air-force-is-using-
taxpayer-money-to-fly-service-members-to-branch-pride-events/ (where the director of
the Air Force's Office of Diversity and Inclusion permitted the use of "unit funds" for
travel expenses of service members to the DAF Pride events).

175.    Further, the military has permitted members to engage in other kinds of political speech and expressive conduct while on activity duty, in uniform, and while using their military title and position.

176.    In March 2021, then-Sergeant Major of the Army Michael Grinston used his official Twitter account to criticize conservative political commentator Tucker Carlson by name. The tweet was shared over 3,000 times and liked by over 12,000 users. *See* Sergeant Major of the Army (@USArmySMA), TWITTER (March 10, 2021, 10:00 PM), https://twitter.com/USArmySMA/status/1369860649292083206.

177.    In similar fashion, the U.S. DoD used its official government website to promote then-Pentagon Press Secretary John F. Kirby's "smite[]" to Carlson's comments on his cable television talk show. *See* Jim Garamone, *Press Secretary Smites Host that Dissed Diversity in U.S. Military*, U.S. DEPT. OF DEF. (March 11, 2021), https://www.defense.gov/News/News-Stories/Article/Article/2534159/press-secretary-smites-host-that-dissed-diversity-in-us-military/.  Rather than limit or discipline this political speech, the military celebrated it.

178.    The LOA cannot survive strict scrutiny because Defendants cannot demonstrate that the burden placed on Mr. Yarbrough's religious exercise was narrowly tailored to serve a compelling state interest. Further, in light of Defendants' arbitrary and capricious application of its policies against speech critical of military policies, the LOA was not rationally related to serve a legitimate state interest.

179.    Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to redress the injuries he is suffering and will continue to suffer because of the LOA,

including undue hardship, reputational injury, and irreparable harm to his military and

civilian career prospects.

180.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that

Defendants violated his constitutional right to the free exercise of religion; and to an

injunction against future substantial burdens on his religious exercise. Additionally, he is

entitled to damages in an amount to be determined by the evidence and this Court, and

the reasonable costs of this lawsuit, including reasonable attorneys' fees.

**FOURTH CAUSE OF ACTION**
**The LOA Is Contrary to the Freedom of Speech**
(APA Constitutional Claim, 5 U.S.C. § 706(2)(B))

181.    Mr. Yarbrough incorporates by reference paragraphs 1–180 of this complaint as though

fully set forth herein.

182.    The LOA complained of herein is a final, reviewable agency action that is causing

actionable injury to Mr. Yarbrough, as set forth in paragraphs 126-128.

183.    The LOA was an agency action that was "contrary to constitutional right." 5 U.S.C.

§ 706(2)(B). Specifically, it was contrary to Mr. Yarbrough's rights under the Free

Speech Clause of the First Amendment.

184.    "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.

185.    The "loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Palmer*,

579 F.3d at 506 (noting that the loss of First Amendment freedoms justifies a preliminary

injunction).

186.    All citizens have a right to hold and express their personal political beliefs. *See Cohen v. California*, 403 U.S. 15, 24 (1971). "[L]earning how to tolerate speech . . . of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" *Kennedy*, 142 S. Ct. at 2430.

187.    "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

188.    "Military personnel retain their basic rights and freedoms as American citizens, subject only to those limitations necessary in the interests of good order and discipline, the unique components of their specialized environment." *Stolte v. Laird*, 353 F. Supp. 1392, 1402–03 (D.D.C. 1972).

189.    "[R]egulations that 'selectively grant[ ] safe passage to speech of which [officials] approve while curbing speech of which they disapprove' are impermissible, even in the military." *Nieto v. Flatau*, 715 F. Supp. 2d 650, 655 (E.D.N.C. 2010) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

190.    In addition, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). This is especially true if speech is made in a public employee's capacity as a private citizen on a matter of public concern, even if it is critical in tone. *See Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968).

191.    That a public employee's speech "touche[s] on matters related to public employment [is] not enough to render it government speech. . . . [T]he 'critical question . . . is whether the

speech at issue is itself ordinarily within the scope of an employee's duties.'" *Kennedy*, 142 S. Ct. at 2424 (quoting *Lane v. Franks*, 573 U.S. 228, 231 (2014)).

192.   When government "imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011)).

193.   Under any relevant standard—whether Mr. Yarbrough spoke as a private citizen, a reservist in a purely civilian status, or an off-duty public employee—Defendants violated the First Amendment by issuing the LOA to him for the content of his remarks.

194.   Mr. Yarbrough had a weighty free-speech interest at his friend's retirement ceremony to speak openly and candidly about his sincerely held religious beliefs and political viewpoints.

195.   He spoke in a private venue to a small group of like-minded friends and family of SMSgt Fish, with few other military personnel present and with no chance of causing prejudice to good order and discipline.

196.   He acted in his personal, civilian capacity when he made his remarks. He spoke about his personal beliefs and viewpoints, informed by his faith.

197.   Although he wore a uniform, that mere fact does not transform his private remarks into official government speech, particularly in light of all the other factual circumstances. Even Defendants' own regulations permit civilians to wear military uniforms during some social occasions. *See, e.g.*, AFI 36-2903, para 11.1.2.

36

198.    Mr. Yarbrough spoke about major matters of public concern. He discussed leadership
        challenges in the military in light of today's "culture wars" and "cancel culture." His
        remarks encouraged his listeners to practice courage and integrity in their affairs, and he
        warned about the dangers of political radicalization within the DoD. His comments
        touched on what he considered pressing public concerns of the day. Drawing on themes
        from Solzhenitsyn and the Christian Natural Law tradition, he discussed the wider
        culture's militant disregard for truth and the corrosive effect of such disregard on those
        who practice constant self-deception.

199.    Defendants would not have issued the LOA to Mr. Yarbrough except for his expressed
        viewpoint and the content of his remarks at the retirement ceremony.

200.    The LOA faulted the parts of his remarks that Defendants believed were too "political"
        because "[m]ilitary members are to remain apolitical and must respect the chain of
        command." Defendants disapproved of the viewpoints expressed in his remarks,
        describing them as "contemptuous," and the LOA referenced "several military members
        expressing displeasure with the contents of [his] speech."

201.    The LOA Mr. Yarbrough received by certified mail at his home in Texas while in his
        civilian capacity was accompanied by six witness statements from the Air Force
        investigation, which contained the comments previously highlighted in Lt Col Schmick's
        July 26 email: "members were offended by the guest speakers comments;" "he definitely
        shared some personal view points that should not have been shared in the retirement
        ceremony"; "informed that there were some inappropriate comments made by the guest
        speaker at the subject event targeted at the LGBT community and other political issues
        currently taking place in our country"; "at this event feeling extremely uncomfortable and

37

insulted"; "let you know that such comments are unnecessary and have no place in a ceremony like this"; and "his comments were hurtful to a group of people." These concerns were all based on the viewpoints expressed by Mr. Yarbrough in his remarks.

202. The LOA cannot survive strict scrutiny review because Defendants cannot demonstrate under these facts that the discipline issued based on Mr. Yarbrough's purely civilian, personal remarks in a small, private venue was narrowly tailored to serve a compelling state interest. Further, Defendants have exempted similarly situated servicemembers from discipline based on the content of their "political protest" speech when officials have approved of the viewpoints being expressed.

203. An example where Defendants encouraged military members—while on active duty and in uniform—to publicly engage in criticism of certain military policies occurred in 2019, when Defendants permitted servicemembers in uniform to participate without discipline in a political parade "to show opposition to the Trump Administration's ban on transgender troops." *See* Ramon Galindo and Monica Garske, *San Diego Unites for 2019 Pride Parade*, July 13, 2019.

204. Even when soldiers openly protested in uniform on duty, the military has chosen, in some instances to not discipline participating soldiers.  In June 2020, several National Guard soldiers took a knee during a protest while on active duty.  *See* Matthew Cox, *Guard Won't Punish Soldiers Who Took a Knee at Protests*, MILITARY.COM (June 8, 2020), https://www.military.com/daily-news/2020/06/08/guard-wont-punish-soldiers-who-took-knee-protests.html.  Army Secretary Ryan McCarthy told reporters that "[w]e're not allowed really to protest in uniform," but the Guardsmen involved did not receive any discipline for openly demonstrating in uniform and on active orders.  *See id.*

205.    The LOA—issued due to the content of Mr. Yarbrough's remarks—is chilling his future speech (and may chill the speech of others) due to reasonable concerns about a further reprimand or more severe consequences or penalties.

206.    As a civilian attorney, Mr. Yarbrough's work may require him to make additional statements in an advocacy capacity that might touch on similar military-related issues of public concern. The threat of future discipline also chills his speech in that arena.

207.    Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to redress the injuries he is suffering and will continue to suffer because of the LOA, including undue hardship, reputational injury, and irreparable harm to his military and civilian career prospects.

208.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that Defendants violated his constitutional right to the freedom of speech; and to an injunction against future burdens on his free speech. Additionally, he is entitled to damages in an amount to be determined by the evidence and this Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION
### The LOA Violates Defendant's Own Regulations
(APA Claim Not in Accordance with Law, 5 U.S.C. § 706(2)(A))

209.    Mr. Yarbrough incorporates by reference paragraphs 1–208 of this complaint as though fully set forth herein.

210.    The LOA complained of herein is a final, reviewable agency action that is causing actionable injury to Mr. Yarbrough, as set forth in paragraphs 126-128.

211.    The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C.

§ 706(2)(A). The LOA is not in accordance with Defendants' own regulations.

212.    The LOA purported to discipline Mr. Yarbrough for failing to "express[] personal views

that align and comport with AFI 51-508 and AFI 1-1;" however, Defendants violated

those same regulations when disciplining him for his religious exercise and private

speech on matters of public concern.

213.    Defendants' regulations recognize that military members retain their constitutional rights

as citizens, with the right to practice religion and express religious beliefs, as well as to

hold and express personal beliefs and opinions within wide, reasonable limits.

214.    Regarding the free exercise of religion by military members, Defendants' regulations

hold that "[e]very Airman . . . should confidently practice [their] own beliefs while

respecting others whose viewpoints differ from [their] own." AFI 1-1, para. 2.11

(7 Aug 12). That same paragraph affirms that "every Airman . . . has the right to

individual expressions of sincerely held beliefs, to include conscience, moral principles

or religious beliefs, unless those expressions would have an adverse impact on military

readiness, unit cohesion, good order, discipline, health and safety, or mission

accomplishment." *Id.*

215.    DoD Instruction (DoDI) 1300.17, para. 1.2b (1 Sep 20), outlines that same guidance and

further guarantees that "[a] Service member's expression of such beliefs *may not, in so

far as practicable, be used as the basis of any adverse personnel action*, discrimination,

or denial of promotion, schooling, training, or assignment" (emphasis added).

216. Regarding the freedom of speech by military members, Defendants' regulations require that "[a] Service member's right of expression should be preserved to the maximum extent possible in accordance with the First Amendment of the Constitution . . . consistent with good order and discipline and the national security." DoDI 1325.06, para. 3b (20 Dec 21); *see also* DoDD 1344.10 (19 Feb 08) (detailing guidance for political activities).

217. In keeping with that DoD guidance, Air Force regulations authorize servicemembers to "express a personal opinion on political candidates and issues, but not as a representative of the AF or DoD." AFI 51-508, para. 2.3.1 (12 Oct 18). While members are prohibited from certain partisan activities, no guidance prohibits a member in a purely civilian capacity from speaking out in a non-partisan manner on matters of public concern.

218. As described herein, Mr. Yarbrough spoke in his personal capacity, at a private event, on private property, to a tiny audience of mostly like-minded friends and family. He spoke about his personal religious beliefs on issues of public concern and did not discuss partisan matters. Nor did his comments in any way advocate violence, illegal discrimination, or extremist ideologies.

219. In disciplining him with an LOA—an "*adverse personnel action*"—Defendants have failed to follow their own regulations. They have failed to recognize Mr. Yarbrough's rights to freely speak about his religion and sincerely held beliefs, and to discuss issues of public concern according to his personal political beliefs and in a non-partisan manner.

220. Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to redress the injuries he is suffering and will continue to suffer because of the LOA,

including undue hardship, reputational injury, and irreparable harm to his military and

civilian career prospects.

221.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that

Defendants have violated their own regulations; and to a declaration that the military has

no future authority to take disciplinary actions against him for his exercise of religion and

his freedom of speech. Additionally, he is entitled to damages in an amount to be

determined by the evidence and this Court, and the reasonable costs of this lawsuit,

including reasonable attorneys' fees.

### SIXTH CAUSE OF ACTION
**The LOA Is Arbitrary, Capricious, and an Abuse of Discretion**
(APA Claim Not in Accordance with Law, 5 U.S.C. § 706(2)(A))

222.    Mr. Yarbrough incorporates by reference paragraphs 1–221 of this complaint as though

fully set forth herein.

223.    The LOA complained of herein is a final, reviewable agency action that is causing

actionable injury to Mr. Yarbrough, as set forth in paragraphs 126-128.

224.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of

discretion." 5 U.S.C. § 706(2)(A). Defendants' issuance of the LOA violated this

standard for several reasons.

225.    First, the LOA was internally inconsistent. It relied on language in AFI 36-2907,

para. 2.1, which itself contemplates the discipline of a reservist in civilian status *only*

where that reservist has committed an "offense." While that term is not defined, it

suggests the sanctioned conduct by the reservist must reach a level of criminality under

the UCMJ.

226. Even for military members on active duty, not every criticism of military policy or leadership will rise to the level of an "offense" under the UCMJ. For instance, in *United States v. Wilcox*, 66 M.J. 442 (C.A.A.F. 2008), an Army servicemember discussed white supremacy with an undercover military investigator and was convicted of violating Article 134, UCMJ. The Court of Appeals for the Armed Forces reversed, stating, "Evidence that the servicemember exchanged messages with the investigator but did not encourage her to join a white supremacist group, overthrow the Government, or take any specific action against any person was not legally sufficient to sustain the servicemember's conviction." This demonstrates the tight nexus required between the targeted speech and the military interest in good order and discipline.

227. Mr. Yarbrough's remarks did not violate any civilian laws, nor did their substance rise to the level of a military violation of the UCMJ. His remarks at a small gathering, warning about politicization in the military and encouraging integrity, competence, and courage, fall far short of any possible violation of the UCMJ (even if he had been in a military duty status, which he was not). These topics represent long-held and important Air Force values and encouraging these values cannot be a punishable violation of the UCMJ.

228. Second, the issuance of the LOA was arbitrary, capricious, or an abuse of discretion because it was not based "on a consideration of the relevant factors," and the agency did not engage in "reasoned decisionmaking." *Judulang v. Holder*, 565 U.S. 42, 53 (2011).

229. Defendants interviewed only six witnesses at an event with 25 in attendance, where many, if not most, attendees expressed agreement with Mr. Yarbrough's remarks. Defendants did not seek to determine whether most of those individuals found his remarks problematic, and they ignored the comments of one witness who testified that

Mr. Yarbrough's remarks were "professional and respectful" and "not directed at any person or group."

230.    Further, the LOA admonishes Mr. Yarbrough for stating that he "fear[ed] . . . 'radical political factions'" influencing the military. Warning against politicization of the military is consistent with American military tradition and is not actionable as an "offense."

231.    Third, the LOA was arbitrary, capricious, or an abuse of discretion because Defendants have exempted similarly situated servicemembers from discipline for publicly engaging in criticism of similar military policies, even while on active duty, and in uniform. *See, e.g.*, Ramon Galindo and Monica Garske, *San Diego Unites for 2019 Pride Parade*, July 13, 2019 (documenting uniformed servicemembers participating in a political parade "to show opposition to the Trump Administration's ban on transgender troops"); Cox, *Guard Won't Punish Soldiers Who Took a Knee at Protests*, June 8, 2020 (reporting that Army National Guardsmen who openly protested while in uniform and on duty would not receive punishment).

232.    Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to redress the injuries he is suffering and will continue to suffer because of the LOA, including undue hardship, reputational injury, and irreparable harm to his military and civilian career prospects.

233.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that the LOA was arbitrary, capricious, or an abuse of discretion; and to a declaration that the military has no future authority to take disciplinary actions against him for his speech done while in civilian status. Additionally, he is entitled to damages in an amount to be

determined by the evidence and this Court, and the reasonable costs of this lawsuit, including reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
### The LOA Violates Mr. Yarbrough's First Amendment Rights
(Claim Under U.S. Const. Amend. I)

234. Mr. Yarbrough incorporates by reference paragraphs 1–233 of this complaint as though fully set forth herein.

235. "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech . . . ." U.S. Const. amend. I.

236. The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373; *see also Palmer*, 579 F.3d at 506 (noting that the loss of First Amendment freedoms justifies a preliminary injunction).

237. As discussed in the incorporated paragraphs herein, Defendants violated Mr. Yarbrough's rights directly under the First Amendment of the United States Constitution— specifically, his rights to the Free Exercise of Religion and the Freedom of Speech.

238. Defendants violated Mr. Yarbrough's religious rights when they burdened his free exercise through a non-neutral and non-generally applicable policy.

239. Defendants violated Mr. Yarbrough's freedom of speech when they disciplined him for the viewpoints and content of his remarks, of which they disapproved.

240. Mr. Yarbrough has no adequate or available administrative remedy or remedy at law to redress the injuries he is suffering and will continue to suffer because of the LOA, including undue hardship, reputational injury, and irreparable harm.

241.    Mr. Yarbrough is entitled to an injunction setting aside the LOA; to a declaration that

Defendants violated his rights under the First Amendment; and to an injunction against

future burdens on his religious exercise and free speech. Additionally, he is entitled to

damages in an amount to be determined by the evidence and this Court, and the

reasonable costs of this lawsuit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Yarbrough respectfully requests that this Honorable Court enter

judgment against Defendants and provide him with the following relief:

(A)    An injunction setting aside Defendants' issuance of the Letter of Admonishment (LOA)

to Mr. Yarbrough and preventing the Defendants from taking future disciplinary actions

against him for his religious exercise and speech done while in his civilian status;

(B)    A declaratory judgment that Defendants' issuance of the LOA violated Mr. Yarbrough's

rights under the First Amendment to the U.S. Constitution;

(C)    A declaratory judgment that Defendants' issuance of the LOA violated Mr. Yarbrough's

rights under the Religious Freedom Restoration Act;

(D)    A declaratory judgment that Defendants' issuance of the LOA violated Mr. Yarbrough's

rights under the Administrative Procedure Act;

(E)    An order directing Defendants to expunge the LOA and all references to it from Mr.

Yarbrough's military records;

(F)    An order declaring that AFI 36-2907, para. 2.1, exceeds statutory jurisdiction under the

Administrative Procedure Act;

(G)    An order declaring unlawful and setting aside Defendants' LOA;

(H)     Nominal damages against General B. Chance Saltzman in his individual capacity under

*Tanzin v. Tanvir*, 141 S. Ct. 486 (2020), for the violation of Mr. Yarbrough's rights under

the Religious Freedom Restoration Act;

(I)     Mr. Yarbrough's reasonable attorneys' fees, costs, and other costs and disbursements in

this action pursuant to 42 U.S.C. § 1988; and,

(J)     All other further relief to which Mr. Yarbrough may be entitled.


Dated: October 3, 2023                          Respectfully submitted,

                                                By: /s/ *Chad Walker*

                                                CHAD B. WALKER
                                                Texas Bar No. 24056484
                                                cbwalker@winston.com
                                                MICHAEL J. WOODRUM
                                                Texas Bar No. 24121899
                                                mwoodrum@winston.com
                                                *Motion for Admission Pro Hac Vice To Be Filed*
                                                COURTNEY E. RIMANN
                                                Texas Bar No. 24132199
                                                crimann@winston.com
                                                *Motion for Admission Pro Hac Vice To Be Filed*
                                                **WINSTON & STRAWN LLP**
                                                2121 N. Pearl Street, Suite 900
                                                Dallas, TX 75201
                                                (214) 453-6500 (telephone)
                                                (214) 453-6400 (telecopy)

                                                ANTONY BARONE KOLENC
                                                Florida Bar No. 0181358
                                                tkolenc@avemarialaw.edu
                                                *Motion for Admission Pro Hac Vice Filed*
                                                **AVE MARIA SCHOOL OF LAW**
                                                **VETERANS AND SERVICEMEMBERS LAW**
                                                **CLINIC**
                                                1025 Commons Circle
                                                Naples, Florida 34119
                                                Tel: (239) 687-5396

JEFFREY C. MATEER
Texas Bar No. 13185320
jmateer@firstliberty.org
DAVID J. HACKER
Texas Bar No. 24103323
dhacker@firstliberty.org
MICHAEL D. BERRY
Texas Bar No. 24085835
mberry@firstliberty.org
DANIELLE A. RUNYAN
Texas Bar No. 24134548
drunyan@firstliberty.org
**FIRST LIBERTY INSTITUTE**
2001 W. Plano Pkwy., Ste. 1600
Plano, Texas 75075
Tel: (972) 941-4444

*Counsel for Plaintiff Jace Yarbrough*